# EXHIBIT 2

CT Corporation

# Service of Process Transmittal

09/24/2018
CT Log Number 534110804

**TO:** Carol Purcell
Endo Pharmaceuticals Inc.
1400 Atwater Dr
Malvern, PA 19355-8701

**RE:** **Process Served in Delaware**

**FOR:** Endo Health Solutions Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | KRIS KOECHLEY, Pltf. vs. PURDUE PHARMA, INC., et al., Dfts. // To: ENDO HEALTH SOLUTIONS INC<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Attachment(s), Complaint |
| **COURT/AGENCY:** | Lucas County Court of Common Pleas, OH<br>Case # G4801CI0201803741000 |
| **NATURE OF ACTION:** | Product Liability Litigation - Drug Litigation - Opioid |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 09/24/2018 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 28 days after receipt, exclusive of the of the day of service |
| **ATTORNEY(S) / SENDER(S):** | CHARLES E. BOYK<br>CHARLES E. BOYK LAW OFFICES, LLC<br>405 Madison Avenue<br>Suite 1200<br>Toledo, OH 43604<br>419-241-1395 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/25/2018, Expected Purge Date: 09/30/2018<br><br>Image SOP<br><br>Email Notification, Jobina Jones-McDonnell jones.jobina@endo.com<br><br>Email Notification, Helen Howlett howlett.helen@endo.com<br><br>Email Notification, Marian Gustafson marian.gustafson@parpharm.com<br><br>Email Notification, Carolyn Hazard hazard.carrie@endo.com<br><br>Email Notification, Par Notice Dept Par.noticeDept@parpharm.com<br><br>Email Notification, Carol Purcell Purcell.Carol@endo.com |



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

CT Corporation

# Service of Process Transmittal

09/24/2018
CT Log Number 534110804

**TO:** Carol Purcell
Endo Pharmaceuticals Inc.
1400 Atwater Dr
Malvern, PA 19355-8701

**RE:** **Process Served in Delaware**

**FOR:** Endo Health Solutions Inc. (Domestic State: DE)

Email Notification, Stephanie Stidham stidham.stephanie@endo.com

Email Notification, Sandra Dilorio Dilorio.Sandra@endo.com

**SIGNED:** The Corporation Trust Company
**ADDRESS:** 1209 N Orange St
Wilmington, DE 19801-1120
**TELEPHONE:** 302-658-7581



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**J. BERNIE QUILTER**
**Lucas County Clerk of Courts**
LUCAS COUNTY COURTHOUSE
700 ADAMS STREET
TOLEDO, OHIO 43604

7017 3380 0000 1630 9060

ENDO HEALTH SOLUTIONS INC
C/O THE CORPORATION TRUST CO
1209 ORANGE ST
WILMINGTON, DE 19801

# LUCAS COUNTY COMMON PLEAS COURT
CORNER ADAMS & ERIE STREETS
TOLEDO, OHIO 43604

## SUMMONS
## CIVIL ACTION

**FILING TYPE:** **OTHER TORT**

ENDO HEALTH SOLUTIONS INC
C/O THE CORPORATION TRUST CO
1209 ORANGE ST
WILMINGTON, DE 19801

G-4801-CI-0201803741-000
JUDGE: JAMES D. BATES

You have the right to seek legal counsel. If you cannot afford a lawyer, you may contact the Legal Services of Northwest Ohio. If you do not qualify for services by the Legal Services of Northwest Ohio and do not know an attorney you may contact the Toledo Bar Association's Lawyer Referral Service (419) 242-2000.

---

You have been named as a defendant in a Complaint filed in this Court by the plaintiff named below. A copy of the Complaint is attached to this Summons.

You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff, if he has no attorney of record, a copy of an answer to the complaint, within twenty-eight (28) days after you receive this Summons, exclusive of the of the day of service or to an amended complaint within the remaining response time to the complaint or 14 days, whichever period may be longer. Your answer must be filed with the Clerk of Court of Common Pleas within three (3) days after the service of a copy of the Answer on the plaintiff's attorney.

If you fail to serve and file your Answer, judgment by default will be rendered against you for the relief demanded in the Complaint.

---

PLAINTIFF (S)
KRIS KOECHLEY
ADMINISTRATOR OF THE ESTATE OF JAMES P KOECHLEY DECEASED
2231 EASTBROOK DR
TOLEDO, OH 43613

ATTORNEY FOR PLAINTIFF(S)
CHARLES E. BOYK
405 MADISON AVE STE 1200
TOLEDO, OH 43604-1223

BERNIE QUILTER
CLERK OF COURTS

Date: September 18, 2018

/s/ Bernie Quilter, Clerk

## IF YOU DO NOT HIRE AN ATTORNEY
### PLEASE READ & RESPOND
(mark one & respond)

☐ I request to be notified by email

My email address ____________________

**OR**

☐ I request to be notified by regular mail
*(Clerk will forward to Court for approval)*

My mailing address ____________________
____________________
____________________

**Send email to:** Lwatt@co.lucas.oh.us
Subject: G-4801-CI-0201803741-000 ENDO HEALTH SOLUTIONS INC
Message: Your email address

**Return this Form with your address to:**
Clerk of Court
Lucas County Common Pleas Court
700 Adams
Toledo, OH 43604

**If you do NOT hire an attorney & fail to respond you will NOT receive notification of events related to this case**

Case Information is available Online at:
www.co.lucas.oh.us/Clerk
click on the "Dockets Online" link

*Local Rule 5.05 H. SERVICE BY CLERK'S OFFICE Once journalized, the Clerk of courts Office will transmit the entries to the email address submitted by the parties. Counsel for a party or Pro Se litigant representing themselves who do not have an email address may, by motion, request ordinary mail service of entries by the Clerk of Courts Office.*

CT Corporation

# Service of Process Transmittal

09/24/2018
CT Log Number 534103196

**TO:** Carol Purcell
Endo Pharmaceuticals Inc.
1400 Atwater Dr
Malvern, PA 19355-8701

**RE:** **Process Served in Ohio**

**FOR:** Endo Pharmaceuticals Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | KRIS KOECHLEY Administrator of the Estate of James P. Koechley, Deceased, Pltf. vs. PURDUE PHARMA, INC., et al., Dfts. // To: Endo Pharmaceuticals Inc. |
| **DOCUMENT(S) SERVED:** | Summons, Attachment(s), Complaint |
| **COURT/AGENCY:** | Lucas County Court of Common Pleas, OH<br>Case # G4801CI0201803741000 |
| **NATURE OF ACTION:** | Deceptive marketing practices relating to prescription opioids |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Columbus, OH |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 09/24/2018 postmarked on 09/18/2018 |
| **JURISDICTION SERVED :** | Ohio |
| **APPEARANCE OR ANSWER DUE:** | Within 28 days after receipt not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Charles E. Boyk<br>CHARLES E. BOYK LAW OFFICES, LLC<br>405 Madison Avenue, Suite 1200<br>Toledo, OH 43604<br>(419)241-1395 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/24/2018, Expected Purge Date: 09/29/2018<br>Image SOP<br>Email Notification, Jobina Jones-McDonnell jones.jobina@endo.com<br>Email Notification, Helen Howlett howlett.helen@endo.com<br>Email Notification, Marian Gustafson marian.gustafson@parpharm.com<br>Email Notification, Carolyn Hazard hazard.carrie@endo.com<br>Email Notification, Par Notice Dept Par.noticeDept@parpharm.com<br>Email Notification, Carol Purcell Purcell.Carol@endo.com<br>Email Notification, Stephanie Stidham stidham.stephanie@endo.com |



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

CT Corporation

# Service of Process Transmittal

09/24/2018
CT Log Number 534103196

**TO:** Carol Purcell
Endo Pharmaceuticals Inc.
1400 Atwater Dr
Malvern, PA 19355-8701

**RE:** **Process Served in Ohio**

**FOR:** Endo Pharmaceuticals Inc. (Domestic State: DE)

Email Notification, Sandra DiIorio DiIorio.Sandra@endo.com

**SIGNED:** C T Corporation System
**ADDRESS:** 4400 Easton Commons Way
Suite 125
Columbus, OH 43219
**TELEPHONE:** 617-531-5859



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

J. BERNIE QUILTER
Lucas County Clerk of Courts
LUCAS COUNTY COURTHOUSE
700 ADAMS STREET
TOLEDO, OHIO 43604


CERTIFIED MAIL®

7017 3380 0000 1630 9077

U.S. POSTAGE PITNEY BOWES
ZIP 43604 $ 009.51⁰
02 4W
0000359174 SEP 18 2018

ENDO PHARMACEUTICALS INC
C/O CT CORPORATION
4400 EASTON COMMONS WAY STE 125
COLUMBUS, OH 43219

# LUCAS COUNTY COMMON PLEAS COURT

CORNER ADAMS & ERIE STREETS
TOLEDO, OHIO 43604

## SUMMONS
## CIVIL ACTION

**FILING TYPE:** **OTHER TORT**

ENDO PHARMACEUTICALS INC
C/O CT CORPORATION
4400 EASTON COMMONS WAY STE 125
COLUMBUS, OH 43219

G-4801-CI-0201803741-000
JUDGE: JAMES D. BATES

You have the right to seek legal counsel. If you cannot afford a lawyer, you may contact the Legal Services of Northwest Ohio. If you do not qualify for services by the Legal Services of Northwest Ohio and do not know an attorney you may contact the Toledo Bar Association's Lawyer Referral Service (419) 242-2000.

---

You have been named as a defendant in a Complaint filed in this Court by the plaintiff named below. A copy of the Complaint is attached to this Summons.

You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff, if he has no attorney of record, a copy of an answer to the complaint, within twenty-eight (28) days after you receive this Summons, exclusive of the of the day of service or to an amended complaint within the remaining response time to the complaint or 14 days, whichever period may be longer. Your answer must be filed with the Clerk of Court of Common Pleas within three (3) days after the service of a copy of the Answer on the plaintiff's attorney.

If you fail to serve and file your Answer, judgment by default will be rendered against you for the relief demanded in the Complaint.

---

PLAINTIFF (S)

KRIS KOECHLEY
ADMINISTRATOR OF THE ESTATE OF JAMES
P KOECHLEY DECEASED
2231 EASTBROOK DR
TOLEDO, OH 43613

ATTORNEY FOR PLAINTIFF(S)

CHARLES E. BOYK
405 MADISON AVE STE 1200
TOLEDO, OH 43604-1223

BERNIE QUILTER
CLERK OF COURTS

Date: September 18, 2018

J. Bernie Quilter, Clerk

## IF YOU DO NOT HIRE AN ATTORNEY
### PLEASE READ & RESPOND
(mark one & respond)

☐ I request to be notified by email

My email address ____________________

Send email to: Lwatt@co.lucas.oh.us
Subject: G-4801-CI-0201803741-000 ENDO PHARMACEUTICALS INC
Message: Your email address

**OR**

☐ I request to be notified by regular mail
*(Clerk will forward to Court for approval)*

My mailing address ____________________
____________________
____________________

**Return this Form with your address to:**
Clerk of Court
Lucas County Common Pleas Court
700 Adams
Toledo, OH 43604

**If you do NOT hire an attorney & fail to respond
you will NOT receive notification of events related to this case**

Case Information is available Online at:
www.co.lucas.oh.us/Clerk
click on the "Dockets Online" link

*Local Rule 5.05 H. SERVICE BY CLERK'S OFFICE Once journalized, the Clerk of courts Office will transmit the entries to the email address submitted by the parties. Counsel for a party or Pro Se litigant representing themselves who do not have an email address may, by motion, request ordinary mail service of entries by the Clerk of Courts Office.*

FILED
LUCAS COUNTY
2018 SEP 17 PM 2:41
COMMON PLEAS COURT
BERNIE QUILTER
CLERK OF COURTS

**IN THE COURT OF COMMON PLEAS OF**
**LUCAS COUNTY, OHIO**
**GENERAL DIVISION**

KRIS KOECHLEY
Administrator of the Estate of
James P. Koechley, Deceased
2231 Eastbrook Dr.
Toledo, OH 43613

Plaintiff,

v.

PURDUE PHARMA, INC.
Long Arm
One Stamford Forum
Stamford, CT 06901;

PURDUE PHARMA L.P
Long Arm
One Stamford Forum
Stamford, CT 06901;

THE PURDUE FREDERICK COMPANY
Long Arm
One Stamford Forum
Stamford, CT 06901;

TEVA PHARMACEUTICAL INDUSTRIES, LTD.
c/o Corporate Creations Network, Inc.
119 E. Court Street
Cincinnati, OH 45202;

TEVA PHARMACEUTICALS USA, INC.
c/o Corporate Creations Network, Inc.

CASE NO. **G-4801-CI-0201803741-000**

JUDGE: **Judge JAMES D. BATES**

**COMPLAINT WITH JURY DEMAND**

Charles E. Boyk (0000494)
Wesley D. Merillat (0080253)
CHARLES E. BOYK LAW OFFICES, LLC
405 Madison Avenue
Suite 1200
Toledo, Ohio 43604
Telephone: (419) 241-1395
Facsimile: (419) 241-8731
Email: cboyk@charlesboyk-law.com
wmerillat@charlesboyk-law.com

*Attorneys for Plaintiff*

119 E. Court Street
Cincinnati, OH 45202;

CEPHALON, INC.
Longarm
41 Moores Road
Malvern, PA 19355;

JANSSEN PHARMACEUTICALS, INC.
c/o CT Corporation
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

JOHNSON & JOHNSON
c/o Registered Agent Solutions, Inc.
4568 Mayfield Rd. Suite 204
South Euclid, OH 44121;

ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC.,
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

JANSSEN PHARMACEUTICA, INC., now known as JANSSEN PHARMACEUTICALS, INC.
c/o CT Corporation
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

ENDO HEALTH SOLUTIONS, INC.
c/o The Corporation Trust Co.
1209 Orange St.
Wilmington, DE 19801;

ENDO PHARMACEUTICALS, INC.
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

ALLERGAN, PLC
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

ACTAVIS, LLC
c/o Corporate Creations Network Inc
119 E. Court Street
Cincinnati, OH 45202;

WATSON PHARMACEUTICALS, INC.
c/o Corporate Creations Network, Inc.
119 E. Court Street
Cincinnati, OH 45202;

ACTAVIS, INC
Corporate Creations Network, Inc.
119 E. Court Street
Cincinnati, OH 45202;

WATSON LABORATORIES, INC.
c/o Corporate Creations Network, Inc.
119 E. Court Street
Cincinnati, OH 45202;

ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.)
c/o Corporate Creations Network, Inc.
119 E. Court Street
Cincinnati, OH 45202;

WATSON PHARMA, INC.
c/o Corporate Creations Network Inc
119 E. Court Street
Cincinnati, OH 45202;

MALLINCKRODT, PLC
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

MALLINCKRODT, LLC
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

McKESSON CORPORATION
c/o Corporation Service Co.
50 W. Broad St. Suite 1330
Columbus, OH 43219;

CARDINAL HEALTH, INC.
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

AMERISOURCEBERGEN DRUG CORPORATION
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

CVS PHARMACY, INC.
c/o C T Corp
1300 E. 9th St.
Cleveland, OH 44114;

WALGREEN CO.
The Prentice-Hall Corporation System, Inc.
50 West Broad Street Suite 1330
Columbus, OH 43215;

WAL-MART, INC. formerly known as WAL-MART STORES, INC.
c/o CT Corporation System
4400 Easton Commons Way Suite 125
Columbus, OH 43219;

DECA HEALTH, INC.
7105 W. Central Avenue
Toledo, OH 43617;

COMPREHENSIVE CENTERS FOR PAIN MANAGEMENT
c/o Decahealth, Inc.
7105 W. Central Avenue
Toledo, OH 43617; and

TOLEDO PAIN SERVICES, PLL
c/o William James, MD
7053 W. Central Ave.
Toledo, OH 43617,

Defendants.

Plaintiff Kris Koechley, as Administrator of the Estate of James P. Koechley, deceased, through undersigned counsel, brings this action against Defendants Purdue Pharma, Inc.; Purdue Pharma L.P; The Purdue Frederick Company; Teva Pharmaceutical Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc., now known as Janssen Pharmaceuticals, Inc.; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Allergan, PLC; Actavis, LLC; Watson Pharmaceuticals, Inc.; Actavis, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc. (f/k/a Actavis, Inc.); Watson Pharma, Inc.; Mallinckrodt, PLC; Mallinckrodt, LLC (collectively, "Manufacturers" or "Defendants"); McKesson Corporation, Cardinal Health Inc., AmerisourceBergen Drug Corporation, (collectively, "Distributor Defendants" or "Defendants") CVS Pharmacy, Inc.; Walgreen Co.; Wal-Mart, Inc. formerly known as Wal-Mart Stores, Inc.; Deca Health, Inc.; Comprehensive Centers for Pain Management; and Toledo Pain Services, PLL (collectively, "Pharmacy Defendants", or "Defendants'); and alleges as follows:

## I. INTRODUCTION

1. On a Thursday afternoon in September 2016, Jimmy Koechley's father came home and discovered a devastating sight.

2. His 30-year-old- son, handsome, charismatic, and kind-hearted, laid unresponsive on the basement floor.

3. Jimmy's mother, Joan, was just finishing her shift at Flower Hospital when she received the call to get home right away.

4. As Jimmy's mother raced home, she fervently prayed to God to please not take her son.

5. She had flashbacks of the day Jimmy was born – recalling the moment her beautiful son, wrapped in a blanket, was handed to her for the first time.

6. She arrived home at street lined with police cars, fire trucks, and ambulances.

7. Defying officer's orders that she was not allowed to go into basement, Jimmy's mother raced past them and went down the steps to find her son laying on the floor as medics frantically worked on him.

8. She was told that she needed to stay back and could not touch him.

9. She again defied them, kneeled beside him, and ran her hands through her child's beautiful hair, begging God not to take her son.

10. As she lifted her head, her eyes were met by the paramedic working on him. He shook his head, pronounced the time, 2:33 p.m., and covered him with a blanket.

11. Opioids, not God, took her son's life.

12. The opioid epidemic is the largest health care crisis in U.S. history.

13. In 2016, there were 42,249 reported opioid overdose deaths in the United States.[1] Among all states, Ohio had the second highest rate of those drug overdose deaths. Among all Ohio counties, Lucas County had 157 unintentional drug overdose deaths, one of the highest in the State. Among those 157 deaths was that of James ("Jimmy") Koechley.

14. This is a wrongful death and survival action based up on the tragic, but avoidable death of Jimmy Koechley, a remarkable young man whose life ended at the age of 30 as a direct and proximate result of the Defendants' joint and/or several negligence and/or misrepresentations in connection with the development, design, research, manufacture, promotion, marketing, advertisement, distribution, and/or sale of prescription opioid drugs.

---

[1] https://www.cdc.gov/drugoverdose/data/statedeaths.html

## II. PARTIES

### A. Plaintiff

15. Plaintiff Kris Koechley is the father of James P. Koechley, deceased, and has been appointed by the Lucas County Probate Court as the Administrator of his Estate in Case No. 2017 EST 0872.

16. On September 15, 2016, Jimmy Koechley died. The cause of his death was identified as Fentanyl (an opioid) toxicity.

### B. Defendant Manufacturers

17. At all relevant times, the Manufacturer Defendants, identified herein, have researched, developed, manufactured, labeled, distributed, supplied, sold, placed into the stream of commerce, marketed, and/or advertised opioid drugs,

18. At all relevant times, the Manufacturer Defendants misrepresented the safety of their opioids – which were defective products that were negligently, recklessly, and/or intentionally developed, manufactured, marketed, labeled, distributed, supplied, sold, and placed into the stream of commerce.

19. PURDUE PHARMA, INC. ("PPI") is a New York corporation with its principal place of business in Stamford, Connecticut. PURDUE PHARMA, L.P. is a limited partnership organized under the laws of Delaware. It is the general partner of PPI and is responsible for promoting and selling opioids. THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut.

20. At all relevant times Purdue was engaged in the manufacture, promotion, distribution, and sale of opioids in the United States, including in Lucas County, Ohio and the surrounding areas, the following Schedule II drugs:

| Drug | Chemical Name |
|---|---|
| OxyContin | Oxycodone hydrochloride extended release |
| MS Contin | Morphine sulfate extended release |
| Dialaudid | Hydromorphone hydrochloride |
| Dilaudid-HP | Hydromorphone hydrochloride |
| Hysingla ER | Hydrocodone bitrate |
| Targiniq ER | Oxycodone hydrochloride and naloxone |

21. OxyContin is Purdue's best-selling opioid.

22. Since 2009, Purdue's annual nationwide sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

23. In 2007, Purdue and three of its executives settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $634.5 million-at the time one of the largest ever federal settlements with a drug company for marketing misconduct. [2]

24. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a Delaware corporation which is registered to do business in Ohio and is a wholly owned subsidiary of Teva Ltd. in Pennsylvania.

25. CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Teva USA acquired Cephalon in October 2011.

26. Teva USA, and Cephalon, Inc. (collectively "Cephalon") work together closely to manufacturer, distribute, market and/or sell opioid products in the United States, including in Lucas County, Ohio and the surrounding areas, the following Schedule II drugs:

| Drug | Chemical Name |
|---|---|

[2] https://oig.hhs.gov/publications/docs/press/2007/SemiannualRelfall2007E.pdf

| | |
|---|---|
| Actiq | Fentanyl citrate |
| Fentora | Fentanyl citrate |

27. Actiq was approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain."[3]

28. Fentora was approved by the FDA only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[4]

29. Teva USA was also in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009.

30. In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs, and agreed to pay $425 million.[5]

31. JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation registered to do business in Ohio with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA, INC., now known as JANSSEN PHARMACEUTICALS,

---

[3] https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020747s030lbl.pdf.

[4] https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021947s015lbl.pdf.

[5] *Press Release, U.S. Dep't of Justice, Biopharmaceutical Company, Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing (Sept. 29, 2008).*

INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

32. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to as "Janssen."

33. At all relevant times Janssen was engaged in the manufacture, promotion, distribution, and sale of opioids in the United States, including in Lucas County, Ohio and the surrounding areas, the following Schedule II drugs:

| Drug | Chemical Name |
|---|---|
| Duragesic | Fentanyl |
| Nucynta[6] | Fentanyl citrate |
| Nucynta ER | Tapentadol |

34. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta (tapentadol) and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

35. ENDO HEALTH SOLUTIONS, INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS, INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation registered to do business in Ohio with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to as "Endo."

36. At all relevant times Endo was engaged in the manufacture, promotion, distribution, and sale of opioids in the United States, including in Lucas County, Ohio and the surrounding areas, the following Schedule II drugs:

| Drug | Chemical Name |
|---|---|
| Opana ER | Oxymorphone hydrochloride extended release |

[6] Depomed, Inc., acquired the rights to Nueynta and Nucynta ER from Janssen in 2015.

| | |
|---|---|
| Opana | Oxymorphone hydrochloride |
| Percodan | Oxymorphone hydrochloride and aspirin |
| Percocet | Oxymorphone hydrochloride and acetaminophen |

37. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

38. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012.

39. ALLERGAN, PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS, LLC acquired ALLERGAN, PLC and the combined company changed its name to ALLERGAN, PLC. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. and the combined company changed its name to Actavis, Inc. as of January 2013 and then ACTAVIS, LLC in October 2013. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of ALLERGAN, PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is registered to do business with the Ohio Secretary of State as a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC. ACTAVIS, LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by ALLERGAN, PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, ALLERGAN, PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. ALLERGAN, PLC, ACTAVIS, LLC, ACTAVIS, Inc., Actavis, LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to as "Actavis."

40. At all relevant times Actavis was engaged in the manufacture, promotion, distribution, and sale of opioids in the United States, including in Lucas County, Ohio and the surrounding areas, the following Schedule II drugs:

| Drug | Chemical Name |
|---|---|
| Kadian | Morphine sulfate |
| Norco | Hydrocodone bitrate and acetaminophen |

41. Actavis also manufactures and sells generic opioids such as a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

42. MALLINCKRODT, PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri. MALLINCKRODT, LLC is a limited liability company organized and existing under the laws of the State of Delaware and licensed to do business in Ohio. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, PLC. Mallinckrodt, PLC and Mallinckrodt, LLC are referred to as "Mallinckrodt."

43. Mallinckrodt manufactures, markets, and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances.

**C. Defendant Distributors**

44. At all relevant times, the Distributor Defendants, identified herein, have purchased and/or distributed, supplied, sold, and placed into the stream of commerce the prescription opioids, without fulfilling the fundamental duty of wholesale drug distributors to detect and warn of diversion of dangerous drugs for non-medical purposes.

45. In 2016, opioids were being prescribed and distributed in Lucas County at a rate of 98 prescriptions per 100 residents. [7]

46. The Distributor Distributors were each on notice that the amount of opioids they distributed and/or sold in Lucas County and the surrounding areas were being prescribed and sold at alarming volume and frequency.

47. The Distributor Defendants were on notice that these controlled substances were susceptible to diversion, abuse, overuse, and otherwise sought for illegal, unhealthy and problematic purposes.

48. Distributor Defendants were in the unique position with the unique duty to inspect, report, or otherwise limit the flow of prescription opioids in Lucas County and the surrounding areas.

49. Despite their knowledge and obligations, Distributor Defendants, in the interest of their own massive profits, negligently, recklessly, and/or intentionally failed to in their duties.

50. Plaintiff alleges Distributor Distributors breaches their duties of care and their legal obligations played an integral role in the chain of opioids being distributed throughout Lucas County and the surrounding areas, including to Jimmy Koechley's prescribing physicians.

51. McKESSON CORPORATION ("McKesson") at all relevant times, operated as a licensed pharmacy wholesaler in Ohio. McKesson is registered with the Ohio Secretary of State as a Delaware corporation. McKesson has its principal place of business located in San Francisco, California. McKesson operates distribution centers in Ohio, including in Washington Court House, Ohio.

---

[7] https://www.cdc.gov/drugoverdose/maps/rxcounty2016.html

52. CARDINAL HEALTH, INC. ("Cardinal") at all relevant times, operated as a licensed pharmacy wholesaler in Ohio. Cardinal is registered with the Ohio Secretary of State as an Ohio corporation, with its principal office located in Dublin, Ohio. Cardinal operates distribution centers in Ohio, including in Groveport, Ohio and Zanesville, Ohio. Cardinal Health, Inc. is an Ohio corporation with its principal place of business in Dublin, Ohio.

53. AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") at all relevant times, operated as a licensed pharmacy wholesaler in Ohio. AmerisourceBergen is registered with the Ohio Secretary of State as a Delaware corporation which may be served through its registered agent for service of process. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania. AmerisourceBergen operates distribution centers in Ohio, including in Lockbourne, Ohio.

54. AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation) dominate 85% of the market share for the distribution of prescription opioids.

**D. Defendant Pharmacies**

55. Pharmacies are the "last line of defense" in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system and, as such, have duties and responsibilities in the oversight of patient care.

56. Pharmacy Defendants operate in Lucas County and the surrounding area.

57. Pharmacy Defendants were aware of the opioid epidemic but turned a blind eye to the outrageous prescription rates in the Lucas County and the surrounding areas in favor of massive profits.

58. CVS PHARMACY, INC. ("CVS") is a Delaware corporation with its principal place of business in Rhode Island. During all relevant times, CVS has sold and

continues to sell prescription opioids in and around Lucas County, Ohio and specifically sold them to Jimmy Koechley.

59. WALGREEN CO. ("Walgreens") is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Walgreens has sold and continues to sell prescription opioids in and around Lucas County, Ohio and specifically sold them to Jimmy Koechley.

60. WAL-MART, INC. formerly known as WAL-MART STORES, INC. ("Wal-Mart") is a Delaware corporation with its principal place of business in Arkansas. At all relevant times, Wal-Mart has sold and continues to sell prescription opioids in and around Lucas County, Ohio and specifically sold prescription opioids to Jimmy Koechley.

61. DECA HEALTH, INC. ("Deca") is an Ohio corporation with its principal place of business in Toledo, Lucas County, Ohio. Upon information and belief, at all relevant times Deca has operated under the registered trade name of COMPREHENSIVE CENTERS FOR PAIN MANAGEMENT ("Comprehensive Centers for Pain") and/or TOLEDO PAIN SERVICES, PLL ("Toledo Pain Services.") Upon information and belief, at all relevant times, Deca, Comprehensive Centers for Pain, and/or Toledo Pain Services (collectively, "Deca") prescribed and sold prescription opioids in and around Lucas County, Ohio and specifically sold prescription opioids to Jimmy Koechley.

## III. JURISDICTION & VENUE

62. This Court has original jurisdiction over this matter pursuant to R. C. § 2305.01.

63. This Court has personal jurisdiction over Defendants pursuant to R.C. §2307.382 because they transact business in Ohio, caused tortious injury in Ohio. All out of state defendants have the requisite minimum contacts with Ohio necessary to constitutionally permit the Court to exercise jurisdiction.

64. Venue is proper in this Court pursuant to Ohio Civ. R. 3(B)(3) among others.

65. This action is non-removable because there is incomplete diversity of residents and no substantial federal question is presented.

## IV. FACTS

66. The practice of medicine centers on informed risk management. Prescribers must weigh the potential risks and benefits of each treatment option, as well as the risk of non-treatment.

67. This bedrock principle of full disclosure is particularly important in the context of chronic opioid therapy because of the risk that patients will become physically and psychologically dependent on the drugs, finding it difficult to manage or terminate their use.

68. Accordingly, the safe and effective treatment of chronic pain requires that a physician be able to weigh the relative risks of prescribing pain medication like opioids, against both (a) the relative benefits that may be expected during the course of the pain management treatment and (b) the risks and benefits of alternatives.

69. Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was

discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

### A. Manufacturer Defendants' Wrongful Conduct

70. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

71. To establish and exploit the lucrative market of chronic pain patients, Manufacturer Defendants developed a well-funded, sophisticated, and negligent marketing and/or distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties to spread misrepresentations about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other Defendants and opioid manufacturers. These statements were unsupported by and contrary to the scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations, including those in Ohio.

72. The Manufacturer Defendants spread their false and negligent statements by marketing their branded opioids directly to doctors and patients in Ohio.

73. Defendants deployed seemingly unbiased and independent third parties that they controlled to spread their false and negligent statements about the risks and benefits of opioids for the treatment of chronic pain throughout geographic areas and patient demographics of Ohio.

74. Manufacturer Defendants' direct and branded ads negligently portrayed the benefits of opioids for chronic pain.

75. The Defendants promoted the use of opioids for chronic pain through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and

medical staff, and fomented small-group speaker programs. In 2014, for instance, these Defendants spent almost $200 million on detailing branded opioids to doctors.

76. The Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by these Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers give the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared by these Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

77. The Manufacturer Defendants' detailing to doctors was highly effective in the national proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing.

78. The Manufacturer Defendants' negligent unbranded marketing also contradicted their branded materials reviewed by the FDA

79. The Defendants' negligent unbranded marketing also contradicted their branded materials reviewed by the FDA

80. The Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid

industry pipeline, from manufacture to distribution to retail

81. These Defendants entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

82. The Defendants collaborated, through the aforementioned organizations and groups, to spread negligent messages about the risks and benefits of long-term opioid therapy.

83. To convince doctors and patients in Ohio that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by conveying negligent misrepresentations to those doctors and patients about the risks and benefits of long-term opioid use, these Defendants made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

84. To convince doctors and patients that opioids are safe, Defendants negligently trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use

of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, they continue to make them today.

85. The Manufacturer Defendants negligently claimed that the risk of opioid addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Some examples of these negligent misrepresentations by opioid manufacturers are: (a) Actavis employed a patient education brochure that negligently claimed opioid addiction is "less likely if you have never had an addiction problem;" (b) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain, negligently claiming that addiction is rare and limited to extreme cases of unauthorized doses; (c) Endo sponsored a website, Painknowledge.com, which negligently claimed that "[p]eople who take opioids as prescribed usually do not become addicted;" (d) Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "most people do not develop an addiction problem;" (e) Janssen distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults which described as "myth" the claim that opioids are addictive; (f) a Janssen website negligently claimed that concerns about opioid addiction are "overestimated;"(g) Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management – that negligently claims that pain is undertreated due to "misconceptions about opioid addiction."

86. These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is

"extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

87. The FDA further exposed the falsity of the Defendants' claims about the low risk of addiction when it announced changes to the labels for certain opioids in 2013 and for other opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

88. The Defendants negligently instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction" – a term used by Dr. David Haddox, who went to work for Purdue, and Dr. Russell Portenoy, a KOL for Cephalon, Endo, Janssen, and Purdue. Defendants negligently claimed that pseudo-addiction was substantiated by scientific evidence. Some examples of these negligent claims are: (a) Cephalon and Purdue sponsored Responsible Opioid Prescribing, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the Let's

Talk Pain website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated;" (c) Endo sponsored a National Initiative on Pain Control (NIPC) continuing medical education (CME) program titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain; (d) Purdue sponsored a negligent CME program entitled Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse in which a narrator notes that because of pseudo-addiction, a doctor should not assume the patient is addicted.

89. The 2016 CDC Guideline rejects the concept of pseudo-addiction, explaining that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer- term use," and that physicians should reassess "pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

90. The Defendants negligently instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids. Some examples of these negligent claims are: (a) an Endo supplement in the Journal of Family Practice emphasized the effectiveness of screening tools to avoid addictions; (b) Purdue's webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose

deaths;" (c) Purdue represented in scientific conferences that "bad apple" patients – and not opioids – were the source of the addiction crisis, when in fact the "bad apples" were the Defendants.

91. The 2016 CDC Guideline exposes the falsity of these misrepresentations, noting that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The Guideline emphasizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

92. To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Defendants negligently claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

93. These misrepresentations were reckless because Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids. Some examples of these negligent claims are: (a) an Endo supplement in the Journal of Family Practice emphasized the effectiveness of screening tools to avoid addictions; (b) Purdue's webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths;" (c) Purdue represented in scientific conferences that "bad apple" patients – and not opioids – were the source of the addiction crisis, when in fact the "bad apples" were the Defendants.

94. The 2016 CDC Guideline exposes the falsity of these misrepresentations, noting that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The Guideline emphasizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

95. To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Defendants negligently claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

96. The Defendants negligently claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences, and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. For example: (a) an Actavis patient brochure stated - "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction;" (b) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain; (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain;" (d) an Endo pamphlet

Understanding Your Pain: Taking Oral Opioid Analgesics, stated "The dose can be increased. . . . You won't 'run out' of pain relief;" (e) a Janssen patient education guide Finding Relief: Pain Management for Older Adults listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages; (f) Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will; (g) Purdue's A Policymaker's Guide to Understanding Pain & Its Management stated that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages; (h) a Purdue CME entitled Overview of Management Options taught that NSAIDs and other drugs, but not opioids, were unsafe at high dosages; (i) Purdue presented a 2015 paper at the College on the Problems of Drug Dependence challenging the correlation between opioid dosage and overdose.

97. These and other representations conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

98. The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to

credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

99. Defendants' marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

100. Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER negligently claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. The FDA warned in a 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

101. These numerous, longstanding misrepresentations minimizing the risks of long- term opioid use persuaded doctors and patients to discount or ignore the true risks. Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long- term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long- term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12

weeks." Despite this, Defendants negligently and misleadingly touted the benefits of long-term opioid use and negligently and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and negligent claims, they continue to make them today.

102. For example, Defendants negligently claimed that long-term opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives; (b) an Endo advertisement that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide Finding Relief: Pain Management for Older Adults stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreation, sex, walking, and climbing stairs; (d) Purdue advertisements of OxyContin entitled "Pain vignettes" implied that OxyContin improves patients' function; (e) Responsible Opioid Prescribing, by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function; (f) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain counseling patients that opioids "give [pain patients] a quality of life we deserve;" (g) Endo's NIPC website painknowledge.com claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse;" (h) Endo CMEs titled Persistent Pain in the Older Patient claimed that chronic opioid therapy had been "shown to reduce pain and improve depressive symptoms and cognitive functioning;" (i) Janssen sponsored, funded, and edited a website, Let's Talk Pain, in 2009, which featured an interview

edited by Janssen claiming that opioids allowed a patient to "continue to function;" (j) Purdue's A Policymaker's Guide to Understanding Pain & Its Management claimed that "multiple clinical studies" had shown opioids as effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients; (k) Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

103. These claims find no support in the scientific literature. The 2016 CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely" (emphasis added). The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."
- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."
- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

104. The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

105. The 2016 CDC Guideline was not the first time a federal agency repudiated the Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken

together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

106. Defendants also negligently and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." The 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

107. In addition, Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all relevant times. According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial

number" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and negligent, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

108. Purdue's competitors were aware of this problem. For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue negligently promoted OxyContin as if it were effective for a full 12 hours. Indeed, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

109. Cephalon negligently marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid- tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

110. Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors

the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example: (a) Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain; (b) Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and (c) in December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News* – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

111. Cephalon's negligent marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

112. Purdue unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive– in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because

the drug was too likely to be abused. In an interview with the *Los Angeles Times*, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs.

113. Purdue has been specifically for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

114. Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. Endo has been found to have failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

115. As a part of their negligent marketing scheme, the Defendants identified and targeted susceptible prescribers and vulnerable patient populations across the country, including here in Ohio. For example, upon information and belief, Defendants focused their negligent marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations.

116. The Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and negligent. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly

addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned these Defendants of this, and these Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Defendants' misrepresentations.

117. Moreover, at all times relevant to this Complaint, the Defendants took steps to avoid detection of and to fraudulently conceal their negligent marketing and unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the negligent marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and negligent statements about the risks and benefits of long-term opioid use for chronic pain.

118. The Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public.

119. Finally, the Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they

cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' negligent messages was not apparent to medical professionals who relied upon them in making treatment decisions.

120. Thus, the Defendants successfully concealed from the medical community, patients, municipalities, and health care-payors facts sufficient to arouse suspicion of the claims that the Plaintiff now assert. Plaintiff did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

121. The Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Defendants were aware that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

122. The Defendants' negligent marketing scheme caused and continues to cause doctors in Ohio to prescribe opioids for chronic pain conditions. Absent these Defendants' negligent marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' negligent marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective.

123. The Defendants' negligent marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their negligent marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000.

By 2011, that spending had tripled to $288 million.

124. The escalating number of opioid prescriptions written by doctors who were deceived by the Defendants' negligent marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and Ohio. In August 2016, the U.S. Surgeon General published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to negligent marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."

125. Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

126. Contrary to the Defendants' misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful.

**B. Distributor Defendants' Wrongful Conduct**

127. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

128. The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90 %

of all revenues from drug distribution in the United States, an estimated $378.4 billion in 2015. The distributors then supply opioids to pharmacies, doctors, and other healthcareproviders, which then dispense the drugs to patients.

129. Since 2011, in Ohio alone, more than 5 billion doses of these dangerous opioid drugs have flowed through the collective hands of Defendants and into our communities.[8]

130. All Defendants share the responsibility for controlling the availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain.

131. For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

132. Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

133. Opioid diversion occurs in the United States at an alarming rate. In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

---

[8] https://www.odh.ohio.gov/-/media/ODH/ASSETS/Files/health/injury-prevention/2016-Ohio-Drug-Overdose-Report-FINAL.pdf

134. Every year, thousands of people in Ohio misuse and abuse opioid pain relievers that can lead to addiction, neonatal abstinence syndrome, overdose and death.

135. Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.

136. The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Another study revealed that 75% of those who began their opioid abuse in the 2000s started with prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

137. Individuals like Plaintiff have been significantly damaged by the effects of the Distributor Defendants' opioid diversion.

138. Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

139. In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* and its implementing regulations as well as R.C. § 2925 *et seq.* These requirements were enacted to protect society from the harms of drug diversion. The Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects

from them. The Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

140. By violating the controlled substance distribution laws, the Distributor Defendants are also liable to Plaintiff as herein alleged.

141. For instance, CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

142. Accordingly, the CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the legal to the illicit marketplace, and there is enormous potential for harm to the public.

143. All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

144. To prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances, including registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of

Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances, acquisition transactions, and distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

145. Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. 21 U.S.C. § 827(d) (l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

146. In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. 21 U.S.C. §§ 827(a)(3), 1304.2l(a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the recordkeeping and reporting requirements.

147. To maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels. When determining if a distributor has provided effective controls, the DEA

Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. 21 CFR § 1301.71.

148. For years the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain and have committed repeated violations of the laws and regulations of the United States as cited above consequently making them liable under Ohio law.

149. To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions. Since 2006, the DEA has conducted one-on-one briefings with distributors regarding their downstream customer sales, due diligence responsibilities, and legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA). The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA emphasized the "red flags" distributors should look for to identify potential diversion.

150. Since 2007, the DEA has hosted no less than five conferences to provide opioid distributors with updated information about diversion trends. The Defendant Distributors attended at least one of these conferences, which allowed for questions and discussions. The DEA has participated in numerous meetings and events with the legacy Healthcare Distribution Management Association (HDMA), now known as the Healthcare Distribution Alliance (HAD), an industry trade association for wholesalers and distributors. DEA representatives have provided

guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.

151. On September 27, 2006 and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

152. The September 27, 2006 letter reminded registrants that they were required by law to exercise due diligence to avoid filling orders that could be diverted into the illicit market. The DEA explained that as part of the legal obligation to maintain effective controls against diversion, the distributor was required to exercise due care in confirming the legitimacy of each and every order prior to filling. It also described circumstances that could be indicative of diversion including ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; disproportionate ratio of ordering controlled substances versus non-controlled prescription drugs; the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to make a determination if the order is indeed suspicious.

153. On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence. The letter reminded registrants that suspicious orders must be reported

when discovered and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility. Finally, the letter directed the registrant community to review a recent DEA action that addressed criteria in determining suspicious orders and their obligation to maintain effective controls against diversion.

154. The Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances.

155. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

156. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

157. For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective andefficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity"

158. McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the

opioid epidemic in our Country."

159. These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

160. In addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

161. The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties recovered by state and federal agencies- including actions by the DEA related to violations of the Controlled Substances Act.

162. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states. In December 2016, a Department of Justice press release announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to certain pharmacies.

163. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a

$13.25 million civil fine. McKesson also was supposed to implement tougher controls regarding opioid diversion. McKesson utterly failed. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer. In 2015, McKesson was in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017, it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.

164. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

165. Relying upon state laws and regulation, various state boards of pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion, a duty recognized under state laws and regulations.

166. Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

167. The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to individuals like Plaintiff.

168. The Distributor Defendants have supplied massive quantities of prescription opioids in Ohio with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

169. Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed to flow into Ohio, and in particular Lucas County, was far in excess of what could be consumed for medically-necessary purposes.

170. The Distributor Defendants negligently, recklessly, and/ or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in Ohio; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

171. On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing patients and citizens of Ohio to perform due diligence inspections to ensure

that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

172. On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the patients and citizens of Ohio, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

173. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the consumer market of Ohio with highly-addictive opioids would allow opioids to fall into the hands of unintended users.

174. It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries, like overdose deaths, would result

175. The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

176. The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to patients and citizens of Ohio, including Lucas County and the surrounding areas, were being dispensed based on invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individuals.

177. The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients in Ohio, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas-and in such quantities, and

with such frequency- that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

178. If any of the Distributor Defendants adhered to effective controls to guard against diversion, injuries to Plaintiff could have have avoided, as well as his consequential death.

179. The Distributor Defendants made substantial profits over the years based on the diversion of opioids. The DistributorDefendants knew full well that individuals in Ohio like Plaintiff would be unjustly forced to bear these injuries and damages.

180. The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed a reckless and/or intentional disregard for individuals like Plaintiff.

**C. Pharmacy Defendants' Wrongful Conduct**

181. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

182. Each participant in the supply chain of opioid distribution is responsible to prevent diversion of prescription opioids into the illegal market by monitoring and reporting suspicious activity. Opioid "diversion" can occur whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain, including at the pharmacy level when prescriptions are filled for any reason other than a legitimate medical purpose.

183. Diversion occurs, for example, whenever entities in the chain of distribution fill suspicious orders for opioids from buyers, retailers or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern

and/or orders of unusual frequency and duration, among others.

184. Diversion can occur, for example, at pharmacies, including whenever the pharmacy fills a prescription despite having reason to believe it was not issued for a legitimate medical purpose or not in the usual course of practice. Diversion can also occur through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

185. Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer/patient. Pharmacies purchase drugs from wholesalers, and occasionally directly from manufacturers, and then take physical possession of the drug products.

186. Since they are the final point of sale for pharmaceuticals and the interface between the supply chain and the consumer, pharmacies general the data that manufacturers as well as wholesale distributors rely upon to measure consumer activity for sale purposes.

187. Most pharmacies purchase their drug supply form a wholesale distributor, although some retailers are large institutional and retail chain pharmacies that obtain drugs directly from a manufacturer. These organizations can deal with manufacturers because they already possess the operational infrastructure necessary to bypass wholesalers - warehousing facilities, distribution vehicles, and inventory control systems. Once a pharmacy takes possession of the drug products, it distributes the products to physicians or directly to consumers.

188. Pharmacies have the most accurate data on individual healthcare professional's prescribing habits. On information and belief, the Pharmacy Defendants provided the Manufacturer Defendants with data regarding individual healthcare professionals in exchange for rebates, or other forms of consideration.

189. Pharmacy Defendants failed to adequately train their pharmacists and pharmacy techs on

how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal.

190. Pharmacy Defendants failed to instruct their pharmacists and pharmacy techs on how to address situations m which they are forced to decline filling a prescription for a customer who submitted a prescription which a pharmacist has identified as suspicious.

191. Pharmacy Defendants have failed to train their pharmacists and pharmacy techs on how to properly exercise their judgment and intuition with respect to determinations about whether a prescription is one that should be filled, or whether, under the law, the pharmacist should refuse to fill it.

192. Pharmacy Defendants failed to adequately use data available to them to identify healthcare professionals that were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids.

193. Pharmacy Defendants failed to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that contributed to the opioid crisis. Upon information and belief, the Pharmacy Defendants failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

194. Pharmacy Defendants failed to conduct internal or external audits of their opioid sales to

identify patterns regarding prescriptions that should not have been filled and to create policies accordingly. Pharmacy Defendants failed to have trained personnel monitoring media and journal publications regarding issues with all drugs being sold, including opioids.

195. Pharmacy Defendants' own sales representatives, agents, employees, contractors, and other persons who rendered services in furtherance of selling more of the Pharmacy Defendants' drugs, upon information and belief, raised a significant number of complaints, statements of concern, and observations of regarding suspicious prescriptions, which the Pharmacy Defendants failed to investigate, act upon, and in some cases even acknowledge or create records of.

196. Pharmacy Defendants knew, reasonably should have known, or, if they did not know, intentionally remained willfully blind to the fact of the media and journal attention published about the opioid epidemic. They intentionally remained willfully blind to the fact that pill diversion and pill mills were increasing at an alarming rate.

197. Pharmacy Defendants failed to track or observe increase in overdose antidote sales, which would have triggered suspicion in a reasonable person or a reasonable sales representative that levels of prescription drug abuse were rampant. The Defendants failed to observe, take notice of, and take into account, government communications to the public and to those involved in the opioid supply chain, such as the Pharmacy Defendants, and take action.

198. The Pharmacy Defendants failed to track profit changes for opioids, which skyrocketed once the epidemic was truly underway and would have signaled to any reasonable person, pharmacist, or executive that a crisis involving narcotic drugs was underway.

199. Upon information and belief, Pharmacy Defendants in fact knew of massive sales and negotiated purchase contracts more favorable to them.

200. Pharmacy Defendants knew that supply procedures had to change to address the ever increasing volume of drugs being sold-which was so patently obvious that it required an update to a larger physical storage space for the volume of pills being moved.

201. Pharmacy Defendants intentionally, maliciously, and repeatedly failed to investigate or act upon complaints, statements of concern and observations made to them.

202. Pharmacy Defendants clearly knew that an opioid epidemic existed as that they considered and/or implemented changes to their security procedures to address retail outlet concerns regarding customers who were, may have been, or had the potential to become addicts.

203. Pharmacy Defendants are set forth in multiple sources, including common law, state law, regulations, law enforcement guidance, and industry guidance.

204. In Ohio, a pharmacist's duty to use due and proper care in filling prescriptions extends beyond simply following the prescribing physician's directions. Further, a pharmacist's duty to use due and proper care is not satisfied by mere "robotic compliance" with the instructions of the prescribing physician.

205. Pharmacists cannot engage in filling opioid prescriptions that are unreasonable on their face due to, among other reasons, the quantity, frequency, dosage or combination that a reasonable pharmacist would not prescribe under the circumstances.

206. Pharmacies are the "last line of defense" in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system and, as such, have duties and responsibilities in the oversight of patient care.

207. In addition to having common law duties, the Pharmacy Defendants have duties outlined by the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801, et seq.

("CSA" or "Controlled Substances Act"), which is incorporated into Ohio law by the Ohio Food, Drug, Cosmetic and Device Law 3715.01.

208. The CSA and Ohio Food, Drug, Cosmetic and Device Law describe duties of the Pharmacy Defendants. These requirements, along with their related regulations and agency interpretations, set standards of care for pharmacy conduct.

209. The CSA and Ohio Food, Drug, Cosmetic and Device Law state that pharmacists must review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid.

210. The CSA and Ohio Food, Drug, Cosmetic and Device Law state that Pharmacy Defendants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." E.g., 21 C.F.R. §1301.71(a).

211. In addition, 21 C.F.R. §1306.04(a) states, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

212. Pharmacists are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice.

213. The DEA's 2010 "Pharmacists' Manual" section on "Valid Prescription Requirements" instructs that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription." Filling such a prescription is illegal.

214. The DEA Manual also states, "The law does not require a pharmacist to dispense a

prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted."

215. The DEA (as well as state pharmacy boards, national industry associations and continuing educational programs) have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient. The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

216. The industry guidance tells pharmacists how to recognize stolen prescription pads; prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; prescriptions written using fictitious patient names and addresses; and so on.

217. Questionable or suspicious prescriptions include: prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances compared to other practitioners in the area; prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; prescriptions that look "too good" or where the prescriber's handwriting is too legible; prescriptions with quantities or dosages that differ from usual medical usage; prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; photocopied prescriptions; or prescriptions containing different handwritings. Most of the time, these attributes are not difficult to detect or recognize; they should be apparent to an adequately trained pharmacist.

218. Signs that a customer is seeking opioids for the purpose of diversion include customers who: appear to be returning too frequently; are seeking to fill a prescription written for a different person; appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; are not regular patrons or residents of the community, and show up with prescriptions from the same physician; drive long distances to have prescriptions filled; seek large volumes of controlled substances in the highest strength in each prescription; seek a combination of other drugs with opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and pay large amounts of cash for their prescriptions rather than using insurance. Ignoring these signs violates industry standards.

219. Other "red flags" include when prescriptions that lack the technical requirements of a valid prescription, such as a verifiable DEA number and signature; prescriptions written in excess of the amount needed for proper therapeutic purposes; prescriptions obtained through disreputable or illegal web-based pharmacies; and patients receiving multiple types of narcotic painkillers on the same day.

220. Filling an unusually high volume of opioids prescriptions given the surrounding population and/or the ratio of opioids to other prescriptions filled can also be a red flag to a pharmacy that diversion and addiction are occurring.

221. All of these issues have been presented by the DEA in pharmacist training programs throughout the United States and have been used as examples by individual state boards of pharmacy and the National Association of Boards of Pharmacy.

222. Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription order. If a pharmacist is ever in doubt, he or she must ask for proper identification. If a pharmacist believes the

prescription is forged or altered, he or she should not dispense it and call the local police. If a pharmacist believes he or she has discovered a pattern of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

223. The Pharmacy Defendants also have duties to attempt to address the suspected addiction of a patient to a drug dispensed by the pharmacist, if there is reason to believe the patient may be addicted.

224. The Pharmacy Defendants have voluntarily undertaken a duty to the public. In news reports and other public documents, it has been reported that the Pharmacy Defendants, through their words or actions, have assured the public that issues affecting public health and safety are their highest priority.

225. On information and belief, the Pharmacy Defendants regularly filled opioid prescriptions for individuals, including Plaintiff in circumstances where red flags were present.

226. On information and belief, the Pharmacy Defendants regularly filled opioid prescriptions for individuals, including Plaintiff that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

227. On information and belief, the Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid prescriptions or protect against corruption or theft by employees or others.

228. On information and belief, the Pharmacy Defendants utilize monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices. For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the red flags presented.

229. In failing to take adequate measures to prevent substantial opioid-related abuse, the Pharmacy Defendants have breached their duties under the "reasonable care" standard, professional duties under the relevant standards of professional practice and requirements set forth in state and federal law.

230. It is foreseeable to the Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to individual pharmacy customers and, thus, to Plaintiff.

231. It is reasonably foreseeable to the Pharmacy Defendants that, when unintended users gain access to opioids, tragic yet preventable injuries and damages will result, including overdoses and death.

232. At all relevant times, the Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in opioid diversion.

**D. Jimmy Koechley**

233. On December 13, 2008, Jimmy Koechley was struck by a drunk driver while riding a moped.

234. The accident left Jimmy with a serious foot injury that required surgery.

235. Following surgery Jimmy was administered opioids for pain.

236. Follow-up after follow-up, physicians continued to casually issue opioid prescriptions to Jimmy.

237. There were no warnings of the addictive nature of these drugs.

238. As Jimmy developed a tolerance to the opioids, his physicians simply increased his dosages.

239. Physicians kept Jimmy on these opioids for more than 7 years following his 2008 accident.

240. Jimmy was prescribed opioids from each Manufacturer Defendant, including but not limited to morphine, fentanyl, hydrocodone, OxyContin, oxycodone, and Percocet.

241. Distributor Defendants were responsible for the distribution of these opioids that were administered and/or prescribed to Jimmy.

242. Jimmy filled his various prescriptions at each of Pharmacy Defendants' pharmacies.

243. The prescription drugs took a tremendous toll on Jimmy's life.

244. Jimmy made numerous and extraordinary attempts to quit taking the opioids, but the withdrawal symptoms were debilitating.

245. Jimmy acknowledged that he had developed a serious addiction to these prescription opioids and made multiple voluntary and concerted efforts at rehabilitation.

246. He sought out medicated assisted treatment to end his opioid dependence.

247. He sought and had the support of his friends and family.

248. Despite valiant efforts to battle his addiction, on September 15, 2016, Jimmy died from an unintentional overdose of fentanyl.

249. Jimmy was a casualty of the opioid epidemic that was born out of corporate greed and has ravaged communities across the country, including Lucas County.

250. Drug manufacturers, uninformed and opportunistic physicians, drug distributors, and pharmacists have all profited from starting and/or perpetuating this crisis.

## V. CLAIMS FOR RELIEF

### COUNT I

### (Negligence and Recklessness)

251. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

252. Manufacturer Defendants negligently, recklessly, and/or intentionally packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted opioid drugs.

253. Manufacturer Defendants failed to use reasonable care to design and manufacturer opioid to make them safe or their intended and approved uses.

254. Manufacturer Defendants concealed and/or failed to use reasonable care to adequately warn the medical community and foreseeable users, such as Plaintiff, of the dangerous risks associated with the use of opioids.

255. Manufacturer Defendants misled the prescribing medical community of regarding the efficacy and benefits of the prescription opioid drugs

256. Manufacturer Defendants perpetuated the misuse, over-prescription, and abuse of opioid drugs, knowing the severity of their highly addictive properties.

257. Manufacturer Defendants failed to remove, recall, and/or otherwise prevent the continued use of its opioid products. Rather, contrarily, such Defendants continued to promote prescriptive use of its opioids in greater dosages and for longer durations.

258. Manufacturer Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of such Defendants' acts, omissions, and/or failures to exercise ordinary care.

259. As the direct and proximate cause and legal result of the Defendants' failures, and as a direct and legal result of the negligence, recklessness, other wrongdoing and actions of Defendants described herein, Plaintiff, a prescriptive user of Defendants' opioid products, suffered significant injuries, including addiction, dependence, tolerance, withdrawal, physical injuries, psychological suffering, economic loss, and ultimately death.

260. Distributor Defendants negligently, recklessly, and/or intentionally purchased, distributed, supplied, sold, and placed into the stream of commerce Manufacturer Defendants' prescription opioids, without fulfilling the fundamental duty to monitor, detect and warn of diversion of dangerous drugs for non-medical purposes.

261. Distributor Defendants, negligently, recklessly, or intentionally failed to monitor, detect and/or warn of abnormal prescription rates in Lucas County and the surrounding areas.

262. Distributor Defendants knew that that Lucas County had an opioid prescription rate of 98% and that its failure to monitor, detect, and prevent would, and did, cause foreseeable harm to individuals, such as Plaintiff.

263. Distributor Defendants perpetuated the misuse, over-prescription, and abuse of opioid drugs, in Lucas County and the surrounding areas.

264. Pharmacy Defendants negligently, recklessly, and/or intentionally filled opioid prescriptions for individuals, including Plaintiff that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

265. Pharmacy Defendants intentionally remained willfully blind to the fact that pill diversion and pill mills were increasing at an alarming rate.

266. Distributor and Pharmacy Defendants had the ability and legal duty to control opioids in the supply chain.

267. Distributor and Pharmacy Defendants were aware of the abrupt and exponential increases in prescription rates, as well as the growing epidemic of prescription opioids being abused and illegally diverted in Lucas County Ohio and the surrounding areas.

268. Distributor and Pharmacy Defendants, through negligence, recklessness, and/or intentional acts and omissions, breached their duty to exercise reasonable care, prudence, watchfulness, and

vigilance commensurate with their legal obligations and the known opioid epidemic and dangers involved in distributing and dispensing these controlled substances.

269. As the direct and proximate cause and legal result of the Defendants' failures, and as a direct and legal result of the negligence, recklessness, other wrongdoing and actions of Defendants described herein, Plaintiff suffered significant injuries, including addiction, dependence, tolerance, withdrawal, physical injuries, psychological suffering, economic loss, and ultimately death.

**COUNT II**
**STRICT PRODUCT LIABILITY**
**(Failure to Warn)**

270. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

271. The opioids manufactured, distributed, and/or sold by Manufacturing Defendants were unaccompanied by proper warnings regarding all possible adverse side-effects and the comparative severity and duration of such adverse effects; the warnings given did and do not accurately reflect the severity or duration of the adverse side effects or the true potential and/or likelihood or rate of the side effects.

272. Manufacturing Defendants knew the limited efficacy and severity of the adverse side effects of its opioids, but aggressively promoted their drugs.

273. As the proximate cause and legal result of the defective condition of Defendants' respective opioids as manufactured and/or supplied and/or marketed, and/or distributed by Defendants, and as a direct and legal result of the conduct of Defendants described herein, Plaintiff suffered significant injuries, including addiction, dependence, tolerance, withdrawal, physical injuries, psychological suffering, economic loss, and ultimately death.

**COUNT III**
**STRICT PRODUCT LIABILITY**
**(Pursuant to Restatement Second of Torts 402a (1965)**

274. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

275. The opioids manufactured and/or distributed and/or supplied by Defendants were defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation of the drug.

276. Alternatively, the opioids manufactured and/or distributed and/or supplied by Defendants were defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, it was unreasonably dangerous, it was more dangerous than an ordinary consumer would expect and more dangerous than alternative drugs available for the treatment of chronic pain.

277. There existed, at all times material hereto, safer alternative medications.

278. Defendants knew that opioids caused serious adverse effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope and severity should have been made.

279. The opioids manufactured, designed, marketed, distributed and/or sold by Defendants were unaccompanied by proper and adequate warnings regarding adverse effects associated with the use of the respective products, and the severity and duration of such adverse effects; the warnings given did not accurately reflect the symptoms, scope or severity of adverse effects and did not accurately relate the lack of efficacy.

280. Defendants did not warn the FDA of material facts regarding the safety and efficacy of their respective opioid products, which facts Defendants knew or should have known.

281. The opioids manufactured and/or distributed and/or supplied by Defendants were defective due to inadequate post-marketing warning or instruction because, after the Defendants knew or

should have known of the risk of injury from the opioid products, they failed to provide adequate warnings to users or consumers of such opioids and continued to promote their products.

282. As a result of the defective condition of the opioid products, Plaintiff was damaged.

283. Therefore, Defendants are strictly liable for the damages caused to the Plaintiff and the manufacturer, distribution, and/or sale of the unreasonably dangerous opioid products.

**COUNT IV**
**Fraud and Misrepresentation**

284. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

285. Defendants violated their general duty not to actively deceive, and have made knowingly false statements and have omitted and/or concealed information which made statements Defendants did make knowingly false. Defendants acted intentionally and/or unlawfully.

286. As alleged herein, Defendants made false statements regarding their compliance with state and federal law regarding their duties to prevent diversion, their duties to monitor, report and halt suspicious orders, and/or concealed their noncompliance with these requirements.

287. As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain.

288. As alleged herein, Defendants knowingly and/or intentionally made representations that were false. Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff, the public, and persons in the medical community whom Plaintiff relied.

289. The false representations and concealments were reasonably calculated to deceive Plaintiff, the public, and his physicians who prescribed opioids for Plaintiff.

290. Plaintiff and his physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

291. Plaintiff justifiably relied on Defendants' representations and/or concealments, both directly and indirectly. Plaintiff's injuries were proximately caused by this reliance.

292. The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of Defendants' fraudulent conduct.

293. Plaintiff seeks damages (direct, incidental, or consequential) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment.

294. Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia*, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

**COUNT V**
**Wrongful Death**

295. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth full herein.

296. Defendants, jointly and severally, failed to adhere to and deviated from, the requisite standards of care set forth in the respective preceding Counts.

297. Such failures and deviations directly caused and/or contributed to cause Jimmy Koechley's death.

298. As a direct and proximate result of the above failures and deviations, Jimmy's next of kin sustained pecuniary loss including, but not limited to, medical, funeral, burial, internment and estate expense.

299. As a direct and proximate result of Defendants' joint and several negligence, gross negligence, and/or recklessness, Jimmy's next of kin sustained loss of services and loss of society of Jimmy.

**COUNT VI**
**Survival Action**

300. Plaintiff incorporates each and every preceding paragraph as if set forth herein.

301. Defendants, jointly and severally, failed to adhere to and deviated from, the requisite standards of care set forth in the respective preceding Counts.

302. Such failures and deviations directly caused and/or contributed to cause Jimmy Koechley to sustain significant pain and suffering.

**COUNT VII**
**Punitive Damages**

303. Plaintiff incorporates each and every preceding paragraph as if set forth herein.

304. Ohio law entitles a plaintiff to make a claim for punitive damages where the actions or omissions of a defendant demonstrate malice, aggravated or egregious fraud. Malice is present where a defendant exhibits a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. This includes extremely reckless behavior.

305. The conduct of Defendants as set forth herein entitles Plaintiff to recover punitive damages.

306. Defendants realized the imminence of danger to Plaintiff and other members of the public, but concealed such dangers, misled the medical community and public about such dangers, and continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

307. As a direct result of Defendants' acts, omissions, and deliberate disregard for the rights and safety of others, Plaintiff suffered the injuries and dangers stated above.

308. An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, the Estate of James P. Koechley, Kris Koechley Administrator, prays that this Court grant judgment against Defendants, jointly and severally, as follows:

a. For an award of damages in an amount to be determined at trial, which amount, exceeds the sum of $25,000.00;

b. Reasonable attorneys' fees and costs;

c. For pre and post-judgment interest;

d. Punitive damages; and

e. All such other relief this Court deems just and fair.

Respectfully submitted,


Wesley D. Merillat (0080253)
Charles E. Boyk (0000494)
CHARLES E. BOYK LAW OFFICES, LLC
405 Madison Avenue, Suite 1200
Toledo, Ohio 43604
Telephone: (419) 241-1395
Facsimile: (419) 241-8731
cboyk@charlesboyk-law.com
wmerillat@charlesboyk-law.com

*Attorneys for Plaintiff*


**JURY DEMAND**

Plaintiff hereby respectfully demands a jury trial as to all issues contained herein.

Wesley D. Merillat (0080253)
Charles E. Boyk (0000494)

**PRAECIPE**

TO THE CLERK:

Please serve summons and complaint upon Defendants by certified mail, return receipt requested, at the addresses listed on the caption.

Wesley D. Merillat (0080253)
Charles E. Boyk (0000494)